Our for the court. There are two independent reasons why PAR does not infringe Farring's patents. First, under the proper claim construction, PAR's product does not have a layer of sodium picasulfate coating the core. Second, as the ANDA makes clear, PAR does not spray coat, instead PAR wet granulates its product. The district court's claim construction was erroneous. Based on the intrinsic evidence, which this court considers to know though, the claims require... Mr. Bruman, let me just ask you. If one accepts the district court's claim construction on coating or layer, I understand you do not dispute that your product meets that limitation as so construed. That is correct. We do not dispute that, but there is the independent reason for non-infringement that PAR does not spray coat. Oh, that I understand, that I understand. So the key pieces of intrinsic evidence supporting the construction that the claims require the picasulfate layer to substantially evenly surround the core are first, the inventor Dow's declaration showing that the preferred embodiment solved the prior art problem. Second, the patent amendments where the inventors disavowed broader coverage and limited their claims to this preferred embodiment. Third, the photos of the granules in the original specification describing a thin layer of picasulfate surrounding the core. And fourth, the examiner's reasons for allowance saying why the preferred embodiment was patentable over the prior art. So since the inventors restricted their invention to this preferred embodiment and disclaimed broader coverage, that is what the claim should cover. It's quite simple. Second, PAR does not employ spray coating. PAR wet granulates its product. Under this court's Abbott v. Torfarm case, PAR's numerous ANDA statements that it wet granulates control the infringement inquiry. And this court has never held that an expert's unsubstantiated assertions based on nothing more than his interpretation of the ANDA and unmoored to any objective industry standards were sufficient to overcome the ANDA statements. Instead, this court has always required hard evidence, like testing PAR's process, to overcome the ANDA. Here, Farring's expert failed to conduct any testing or even compare PAR's process to a reference standard. Excuse me for interrupting you. Isn't it true that the same equipment is used, whether you are using wet granulation or spray coating? It is undisputed that the same equipment can be used for both. Typically, when a top spray configuration is done, which is what has been used here, it is made to wet granulate. The specifications for top spray are wet granulation. When it's bottom spray configured with the sprayer at the bottom, that configuration is specifically to spray coat. So while the same equipment can be used for both, typically there are, of course, outlier instances where they are reversed and used for unconventional settings. But under the conventional settings, which PAR used, top spray is wet granulation. So here, Farring- Your position here is that the district court clearly erred in relying on Dr. Dewey's testimony. No, well, it's Dr. Johnson's testimony for the spray coating issue. And it's not a credibility issue. The issue is one of sufficiency of the evidence. You have an expert who just looked at the ANDA and speculated. He never conducted any testing or never even compared PAR's process to any, not a single piece of literature over the countless decades of literature that have amassed on spray coating and wet granulation, not a single citation to any literature, just absolute unmoored speculation. And that is insufficient basis under Abbott v. Torfarm for Farring to carry its burden of persuasion. This court is very clear. There have been over 30 cases that have cited Abbott v. Torfarm. Many have been cited in this court. And it is a constant that the district court holds, when the district court holds that unsubstantiated assertions may tip the scale, this court has reversed. In the Alcon, I'm sorry, in the Bramante Dean patent litigation case, this court reversed the district court, and that's 643 F. 3rd, 1366. This court reversed the district court holding because it was based on unsupported expert testimony. In this case, in this court's Baer v. Ewan case from 2000, which is in our brief, the court affirmed the district court's holding that unsubstantiated assertions do not overcome the ANDA statements. So the district court wrongly found that par spray coats, and this court should reverse that determination. Wasn't that decision mainly based on credibility of the experts? The credibility judgment more than anything? Well, what the case law is very clear on is that when you have objective evidence, there is not a credibility determination among the experts if you were ignoring that independent objective evidence. And that's the Baer v. Watson case, not the Baer v. Ewan. The district court seems to have found the testimony of Farine's expert, Dr. Johnson, more credible than your expert. But like I said, this is not an issue of credibility. Even if you believe every single thing that Dr. Johnson says, under this court's Abbott v. Torr farm and its progeny, which there are numerous of, just unmoored speculative statements, just looking at the ANDA and testifying about it, has been held several times to be not sufficient. In fact, there's not a single case. Isn't it true, though? Don't you agree that I understand that the best evidence of what process PAR used comes from the ANDA itself? That's your position, right? That is correct. So you say it's unmoored, but it was based on the ANDA's description of the process that PAR uses. PAR consistently, and several times throughout the ANDA, says they are wet granulating. They set the specifications for wet granulation. The equipment is set for wet granulation. Because the label is wet granulation, you think that that comes with a presumption and some sort of testing should have been done. Do I understand that? It's not simply a label, Your Honor, with all due respect. I understand what you're saying, but just to interrupt you for a minute, I just want to know, if the ANDA characterizes the product in a certain way and uses a particular label, does that create some sort of evidentiary presumption that that label is properly used? I don't think your situation applies here, because here it is not a label. This is a very technical term, wet granulation, that has been understood for decades to mean a certain technology. Spray coating is over here as a completely separate technology. The problem I have is I'm an appellate judge, and my job is to look for clear error. And what you're saying is, as I understand it, is that I should look at the facts where two sophisticated parties with two able, sophisticated experts are presenting two different interpretations of what that process is. And you're saying that yours is correct, and characterizing the other one as being unmoored. But I look at the other one, and there's pages and pages of testimony and explanations for why it is the appropriate understanding. So maybe you need to dig into a little bit more detail on why you think that the contrary expert testimony is unmoored. Because there is not a single objective evidence saying why what he's saying is at all credible with regard to the technology. He does not say, for example, when he says, there's a six degree temperature drop, therefore it's clearly spray coating. Why? Show me a reference that says that. Then I might believe you, and I might be able to rebut that. But simply testifying, putting your finger in the wind, and saying six degrees means spray coating does not tell me why. Why not five? What about seven? There's nothing. It's unhinged. So getting back to the construction, which this court reviews de novo, the four pieces of intrinsic evidence, the JAL declaration, the patent amendments, and well, two of those, the JAL declaration and the patent amendments, which go hand in hand. That is a clear disavowal of coverage. You have the patent applicant saying, here is what I invented, the spray coated layer, which is shown, for example, in the JAL declaration figure two. And here is how my invention solved the prior art problem with the PECOLAX product. And that's shown in figure one of the declaration and discussed in paragraph seven. So it's similar to the Hockerson-Halberstadt case that is cited by Ferring. The inventor drawing submitted in prosecution limits the claims. And the exact same thing happened in the Hockerson-Halberstadt case. And this court found that that drawing submitted in prosecution did limit the scope of the claims. Same situation here. You have the amendment where the patent applicants told the patent office that they were claiming this preferred embodiment to overcome the prior art PECOLAX product, their own product. So this is a extremely narrow invention. It is a slight improvement, narrowly capturing the inventor's contribution over his prior art process and product. So that is exactly what the claim should cover. Are you also maintaining your O2 micro argument? So procedurally, the court below made several errors which led to these substantive errors, failing to consider the intrinsic evidence. O2 micro stands for the proposition that when there is a dispute over claim language, the district court has a duty to resolve that. And simply saying the plain and ordinary meaning applies when it does not resolve that dispute is not sufficient. That is, we were citing O2 micro as an indicator that this smells funny. The district court did something wrong because the entire argument at Markman was about scope, how much picosulfate coverage is necessary on the court. And the district court refused to address that, despite our several pleas for him to do so. But you acknowledge, for example, that O2 micro is very different because this was a bench trial and not a jury trial. I believe this court does have cases saying that the district court can construe claim terms when it wants to, absent an O2 micro problem where the claim construction is given to the jury and the court doesn't construe the term. That's true. And I'm in my rebuttal time, so I'd like to just address your question and sit down. The problem was not the rolling claim construction. Absolutely, that is fine under this court's precedent. The problem was, when we got to trial, instead of where Phillips says you have to look at the intrinsic evidence in order to determine the plain and ordinary meaning, here the court said you can't look at it. It was the absolute opposite of Phillips. It was the pre-Phillips way that this court, once Phillips came out, said you can't do it that way. That is what the district court did. And I'll reserve the rest of my time. Is that because it had already resolved the dispute? Why should it revisit a dispute that's already been resolved? Assigning a term, the plain and ordinary meaning, when the scope of that term has not been resolved, he did not resolve the dispute.  I'll sit down now and reserve the rest of my time. Okay. Counselor Bork, is that correct? Bork, actually. Thank you, Your Honor. May it please the court. I'd like to start with the claim construction issue, and I'd like to address basically two issues. What I didn't hear my learned colleague explain was that the construction that Parr now posits is the substantially evenly surrounding the core for coding, encoded, and even layered. And quite frankly, that finds no support in the intrinsic record, and I can take you through that. I heard today that we have different intrinsic record evidence that they're relying on. Quite frankly, this amendment issue appeared for the first time in their gray brief, in their reply brief. It was never argued below, and therefore, it should be discounted. Nevertheless, I can address it substantively if we need to. The second thing I'd like to address is that there were two experts preparing. One was Dr. Johnson, who testified about the spray coding. The other was Dr. Davies, who gave the plain and ordinary meaning for the terms coding and coding as the district court permitted. And that meaning was a layer of substance on the outer surface of another substance. And the issue is not quantity. It was in the Markman hearing, but through expert discovery and actually at trial, the issue became location. Where is it? It's on the outer surface of the potassium bicarbonate core, and that's important. So let's, Parse started with the Dow Declaration, but I'd sort of like to start with the three pieces of evidence that were argued throughout from Markman all the way to trial as somehow limiting the plain and ordinary meaning of the term coded and coding. It started with a paragraph in the specification in column nine, and that's column nine, lines 62 to 67, where there is language that talks about sprayed very evenly. There's never been any effort by Parse to explain how sprayed very evenly equates to substantially evenly surrounding the core. In fact, this whole dissertation in column nine, it's important for the court to understand, it's just describing what the improvements were to the process when they moved to spray coding, which eliminated the problem of the prior process, which was lack of homogeneity, both in the intermediate products and in the final product. And that's explained starting at column nine, line 30 through 38. The problem was the prior process was a wet mixing process. That led to two problems. Because of the wetness of the process, some of the potassium bicarbonate dissolved. It's a very soluble material, which led to the formation of aggregates, which is what's described in the Dow Declaration, and also with fines. And when you had that disparate particle size, you'd get some particles that had too much sodium picosulfate, which is an active ingredient, and some which had too little. And so the problem, and this is all explained in the Dow Declaration, which is the important part about the Dow Declaration, is it's explaining the improvements in the process in response to an obviousness rejection at the patent office. But I'll get to that in a minute. So let's go back to the column nine. The column nine evidence, which is sprayed very evenly, is not equated at all with how that means substantially evenly surrounding. And in fact, if you look at the actual language used, it supports Dr. Davies' plain and ordinary meaning, where it says, and this is at line 64, the sodium picosulfate solution may be sprayed very evenly onto the surface of the potassium bicarbonate granules and dried immediately. That's the whole point of the invention. You spray it on, you get an even distribution across the particle bed, and it's dried rapidly so that you don't have this dissolution of the potassium bicarbonate, which leads to the aggregates, which leads to the problem and the disparity in the particle size. The other part of their construction is their expert took the position that this sprayed very evenly was on a particle-by-particle basis. And our expert testified that he couldn't even understand how that could even happen. Spray coating is a very random process. Think of it like the lottery machine, and you've got a top spray coming down, and the spray is going on all of these bouncing little balls. There's no way that the solution is going to hit every single particle the same way. And there's no way that you're going to have it substantially evenly surrounding each individual particle. So let's turn to the two other pieces of evidence that they rely on. One is this, the images. Let's talk about the images. The images were originally in the application, and the patent office determined that they lacked clarity and, therefore, were not of any use, and they were removed from the specification. So they're not part of the specification, but more importantly, they lack clarity. But secondly, the point is the example is not limiting in any way, shape, or form. It's not like the cases where the court has used examples to be limiting. For example, the medicines v. Mylan case, where there was a question of what efficient mixing meant, and there was no ordinary and customary meaning of what efficient mixing meant, and the specification was vague and gave a laundry list of various mixing techniques. And so the court looked to two examples, example four, which was inefficient mixing, and example five, which was efficient mixing, to determine what efficient mixing meant, and they limited the definition of efficient mixing to that particular example. That's not the situation here. It's described repeatedly throughout the specification about what the purpose of the invention was, and the reason was to spray coat so that you could get an even distribution of the sodium pico sulfate across the potassium bicarbonate granules, and therefore you didn't have the problems in the prior art. And quite frankly, that's exactly what the Dow Declaration explains, and it starts in paragraph seven. He talks about the problems with the prior process, the problems with powdered dosage forms in general in paragraph nine, and that you had to have equal particle size distributions. And then he goes on in paragraph 12 to talk about the new process where it's sprayed onto the surfaces of the potassium bicarbonate granules. And then he said, hence the premixed granules were prepared differently, and they contain a core of potassium bicarbonate with an external, again location, coating of the sodium pico sulfate. So importantly, there's nothing in any of this intrinsic evidence that even gets you close to substantially evenly surrounding. Surrounding isn't even in the claim language. I know there's a recent case that came out of this court, Aptalis versus Apotex, where the issue was continuity of an extended release coating, and in that case there was the language of surrounding in the claims. There's none of that language in this case, and quite frankly, continuity is not even an issue anymore. Both parties' experts agreed that continuity was not required. And it all comes down to location. Where is the sodium pico sulfate? Let's turn to the hard evidence issue. There was hard evidence. Dr. Davies did testing of Parr's product. Dr. Davies came in and testified that all of the images that he saw of the particles from Parr's process had the sodium pico sulfate on the outer surface, namely an external coating of the sodium pico sulfate on the potassium bicarbonate granules. He testified he never saw any particles where there was potassium bicarbonate in the, I mean, excuse me, sodium pico sulfate in the core. That's important. Also, Dr. Johnson relied upon Dr. Davies' testing as confirming that because that he saw no agglomerates, which is what you would get in a wet granulation process, it confirmed his opinion that the process was spray coating. Let's talk about Dr. Johnson. Dr. Johnson has 20 years of experience with spraying processes. He has experience both with wet granulation and spray coating. That's testimony that's in the record. That's testimony that the district court heard. He did a detailed analysis of Parr's process. He looked at the executed batch records, which we, let's not muddy the water here. We all agree the ANDA is the best evidence of what the product is, the likely product that is going to be sold. But let's take a look at what those cases are saying. They're not saying it's the label that you put on it in the discussion of your ANDA, of what it is, it's the specification. Can I ask a question about those cases before you go on? Sure. In those cases or those situations where the ANDA, the party that drafted the ANDA, was trying to take a different tact than how the ANDA labeled the product? Or is that true? No, I don't think so. I can talk specifically about buyer VL1 because I was involved in that case. In that case, they came in and they had a specification for a specific surface area of the active ingredient. And the original specification would lead to infringement. During the course of discovery, they changed the specification, altered it such that they could never infringe on the patent. And the court found that they were legally obligated to follow that specification and therefore they could not, the product they were likely to sell could not infringe. But the important point is, it's the specifications that govern. Dr. Johnson looked in detail at the executed batch records. He went by process parameter by process parameter. He evaluated them. He looked at each of them individually. And then in the totality, he said, looking at this process as a whole, based on all these process parameters, in my mind, there's no question it's break coding. He was cross-examined on it. He was cross-examined about his relative terms. Obviously, that did not affect the judge's determination and his credibility. It was a credibility determination. He heard both experts testify. And he found Dr. Johnson to be more credible than Dr. Oxford. Could you address the O2 micro argument? Sure. First off, this was a bench trial, so I'm not so sure O2 micro even applies. But what I would say is, Judge Andrews actually determined claim scope at the markment. What he did was he considered all of the intrinsic evidence that was cited by par, and he found it to not be limited. And therefore, he gave the term, coded and coding, the only terms that were at issue at that point, their plain and ordinary meaning as Phillips instructs. Was there an order in limine with respect to its construction? Excuse me? An order in limine? Was there a motion? There was. There was. And I can explain that. So what happened was, we went through claim construction, came up, par had two constructions at the time. One was a shell that surrounds a core, and then there was a discussion of covering layer. The court basically came out and said, I'm going to give it its plain and ordinary meaning. I find the intrinsic evidence, the very intrinsic evidence that they continued to rely upon at trial to not be limiting. We went through expert discovery, and their expert came up with a new construction. There were all these ever-changing constructions. Then it became substantially evenly surrounding was the limitation that they put forward both for coded and coding and for this new term layer that they decided needed to be construed after the markment. But the key was, they had this substantially evenly surrounding language, which to this day, their expert testified at trial that he didn't even know how you would determine what legal test you would, I mean, what technical test you would make to determine whether it was substantially evenly surrounding. He basically said, I can tell you that it's not, but I can't tell you what it is. I don't know how to tell you it is substantially evenly surrounding. So that construction provides no clarity, as the judge would say. So then we got to trial. There was a motion in limine to answer Your Honor's question. So what happened was, we said, they're still trying to do claim construction throughout expert discovery, so we filed a motion in limine. Now, importantly, the judge denied the motion in limine, but in doing so, he said, I'm not going to allow you to introduce the intrinsic evidence that I've already determined is not limiting for claim construction purposes. I allow you to introduce it for other purposes, and on an objection by objection basis, I'll determine whether that's claim construction or whether that's used for some other purpose. We went through trial, and we continued to, we objected and did as the judge instructed, and in his opinion, he came down and agreed with us that Dr. Augsburger was still trying to do a claim construction. So I understand that my time is out. Are there any further questions? Thank you. Thank you very much. Thank you. Just a couple of issues to clarify. First, they neglected to tell you that the first time they gave a construction ever on the meaning of the terms was after Markman. So the only time that we could have addressed that construction was at trial, yet the district court denied us the very evidence necessary to rebut their first time presented construction. Regarding the bulk material issue, the claim should not be limited to the bulk material. The claims are very clear. A layer, singular, on A core, singular. There's nothing about bulk material. The citations that they give are vague to the specification, and they don't trump the very clear, intrinsic evidence that shows that the exact invention that the inventor invented is what he wanted to limit the claims to. And I see my time's up. Is there any questions? You can conclude. Thank you. Regarding the Dr. Davies, yes, Dr. Davies testified that the five dots were a layer. What we're saying is, under the correct claim construction, that cannot be a layer. Thank you very much, Your Honor. Okay, thank you. That's our argument for the day. This court will now take these under advisement.